# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELMER DWAYNE JAMES,<br><br>                              Petitioner,<br><br>vs.<br><br>MATTHEW CATE, Secretary,<br><br>                              Respondent. | Civil No.    11cv1910-IEG (NLS)<br><br><br>**REPORT AND RECOMMENDATION**<br>**OF UNITED STATES MAGISTRATE**<br>**JUDGE RE DENIAL OF PETITION**<br>**FOR WRIT OF HABEAS CORPUS** |

This Report and Recommendation is submitted to United States District Judge Irma E. Gonzalez pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

## I.

## FEDERAL PROCEEDINGS

Elmer Dwayne James (hereinafter "Petitioner"), is a state prisoner proceeding pro se and in forma pauperis with a Petition for a Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Petitioner was convicted of first degree robbery in the San Diego County Superior Court and sentenced to five years in state prison. (Pet. at 2-3.) The sole claim presented in this Court alleges Petitioner was denied his Sixth Amendment right to the effective assistance of counsel because his appointed counsel failed to object to, or appeal

1  the decision of, the prosecutor and the trial judge to decline to grant immunity to a prospective

2  defense witness who refused to testify on Fifth Amendment grounds.  (Pet. at 6.)

3      Respondent initially moved to dismiss the Petition on the basis that Petitioner had failed

4  to present his claim to the state supreme court, and it was therefore unexhausted.  (ECF No. 6.)

5  Respondent's motion was denied on the basis that the technical requirements for exhaustion

6  were satisfied despite the fact that Petitioner admitted he had not presented the claim to any state

7  court, because state judicial remedies were no longer available with respect to the claim.  (ECF

8  No. 12.)  Respondent subsequently filed an Answer.  (ECF No. 17.)  Respondent preserves for

9  appeal the exhaustion argument, and contends that federal habeas relief is unavailable because

10 the sole claim presented in the Petition is procedurally defaulted and without merit.  (Answer

11 at 1-20.)  Petitioner was granted leave to file a Traverse but has not done so, and has not

12 responded to the Answer.

13     For the following reasons, the Court finds that the sole claim presented in the Petition is

14 procedurally defaulted and that Petitioner has failed to demonstrate cause, prejudice or the

15 existence of a fundamental miscarriage of justice sufficient to excuse the default.  The Court

16 alternately finds the claim to be without merit.  Accordingly, the Court **RECOMMENDS** the

17 Petition be **DENIED**.

18                                                        **II.**

19                                      **STATE PROCEEDINGS**

20     In a three-count amended information filed in the San Diego County Superior Court on

21 December 16, 2008, Petitioner was charged with first degree robbery in violation of California

22 Penal Code section 211 (count one), first degree burglary in violation of California Penal Code

23 section 459 (count two), and assault with a deadly weapon with force likely to cause great bodily

24 injury in violation of California Penal Code section 254(a)(1) (count three).  (Lodgment No. 1,

25 Clerk's Transcript ["CT"] at 8-12.)  The amended information also alleged that the residence

26 was occupied during the burglary, that Petitioner personally used a deadly weapon and

27 personally inflicted great bodily injury with respect to all three counts, and that he had served

28 a prior prison term.  (Id.)

On May 5, 2009, the jury found Petitioner guilty of robbery and not guilty on the other two counts.  (CT 50-55.)  The jury found that the residence was inhabited at the time of the robbery, but returned not true findings on the allegations that Petitioner used a deadly weapon and inflicted great bodily injury during the commission of the robbery.  (Id.)  Petitioner admitted the truth of the prior prison allegation, and was sentenced to five years in state prison.  (RT 365-67, 382.)

Petitioner appealed his conviction raising two claims: (1) the trial court's failure to grant immunity to a prospective defense witness violated his federal constitutional rights to compulsory process and due process of law; and (2) the abstract of judgment inaccurately reflected the amount of time he had been incarcerated prior to the conviction.  (Lodgment No. 3.)  The appellate court, in an unpublished opinion, directed that the abstract of judgment be corrected to reflect the proper number of custody credits, and affirmed the judgment in all other respects.  (Lodgment No. 6, People v. James, No. D055352, slip op. at 13 (Cal.Sup.Ct. Aug. 19, 2010).)  The appellate court found that although Petitioner's trial counsel had objected when the prosecutor refused to grant immunity to the proposed defense witness, Petitioner had forfeited any claim that the trial court should have exercised its discretion to grant judicial immunity because defense counsel had not requested judicially-conferred immunity.  (Id. at 6-10.)  The appellate court alternately denied the claim on its merits, finding that the trial court lacked the inherent authority to grant judicial immunity, but that even if judicial immunity was available, the proffered testimony of the proposed defense witness was not "clearly exculpatory" so as to warrant immunity.  (Id. at 10-12.)  Petitioner subsequently raised the same claim in the California Supreme Court in a petition for review, which was summarily denied without comment or citation of authority.  (Lodgment Nos. 8-9.)

As discussed in detail below, in contrast to the claim raised in the state courts challenging the trial judge's decision not to grant immunity, Petitioner now claims that his appointed counsel was deficient in failing to object to, and appeal the decision of, the prosecutor and the trial judge not to grant immunity.  (Pet. at 6.)

/ / /

### III.

### TRIAL PROCEEDINGS

Angela McGrath, a sophomore at San Diego State University, testified that on the afternoon of October 18, 2008, she was sitting on her bed reading when she noticed a man crouched down against the wall on her patio. (Lodgment No. 2, Reporter's Transcript ["RT"] at 52-56.) The patio door was open and McGrath was very concerned; she said "hello" to the man several times but received no response; she informed her roommate, who approached the man as McGrath called 911, but the man jumped over the fence and ran away. (RT 56-57.) The audio recording of the 911 call was played for the jury and a transcript is in the record. (RT 58; CT 65-68.) McGrath did not see the man's face and could not identify Petitioner at trial, but she did see his hair and what he was wearing, which she described to the police. (RT 59-60.)

William Hlobik testified that he is unemployed, that he moved to San Diego from Connecticut in July of 2008, and that he has lived at the Travelodge motel on El Cajon Boulevard in a room paid for by his mother since arriving in San Diego. (RT 61-62.) On October 18, 2008, he was watching television when he heard a knock on the door. (RT 63.) He did not see anyone though the peephole and received no response when he asked if anyone was there. (RT 64.) Hlobik sat down on the bed, which is very close to the door, and heard a second knock, and again did not see anyone though the peephole. (Id.) When he cracked the door a few inches to see who was there, the door was forced open. (RT 64-65.)

Hlobik testified that Petitioner, whom he had never met before, forced his way through the door and attacked him. (RT 65-66.) Hlobik is five feet, nine inches tall and weighed 160 pounds, whereas Petitioner was over six feet tall and weighed 260 pounds. (RT 62, 116.) Hlobik said he was knocked backward onto his bed and hit on the back of the head with a rubber mallet. (RT 65-67.) Petitioner said: "What are you going to do? Call the cops?" and said that whatever was Hlobik's now belonged to Petitioner. (RT 67.) Hlobik picked up an empty beer bottle and swung it at Petitioner but was not sure if he hit him. (RT 67, 77.) The door was closed at that point and someone knocked; Hlobik said they stopped fighting as Petitioner opened the door. (RT 79.) When the door opened Hlobik ran through it, passing a black woman

named Kiwi who Hlobik said he knew casually from outside a nearby liquor store where he would occasionally give her spare change.  (RT 79-80.)

Hlobik said he ran straight to the motel manager's office and called the police.  (RT 82.) An audio recording of the 911 call was played for the jury and a transcript is in the record.  (RT 84; CT 59-64.)  As he was calling the police, Petitioner walked across the parking lot out onto El Cajon Boulevard, yelling at Hlobik as he walked away, and accusing Hlobik of attacking him. (RT 104-05.)  Hlobik said he was bleeding badly from the back of his head and was taken to the hospital where he received about 20 stitches in his scalp; he said he had been going to a doctor for treatment of severe headaches ever since that day.  (RT 84, 107.)  He had a scar on his scalp and his medical records regarding the treatment of his injuries were admitted into evidence.  (RT 85-86.)  He denied giving Petitioner permission to take his cell phone and wallet, which were missing when he returned to the room.  (RT 86.)  He said he had never missed a payment for his room, and that the manager called his mother directly every week for payment.  (RT 89-90.)

Jonathan Cooksey, a San Diego Police Officer, testified that he received a call about 1:00 p.m. on October 18, 2008, reporting an assault with a deadly weapon by a black male wearing dark clothing.  (RT 109-110.)  Before reaching the location of the assault, Officer Cooksey received another call about a prowler in a nearby apartment building matching the same description.  (RT 110-11.)  He located the suspect, a black male about 260 pounds dressed consistently with the descriptions given by McGrath and Hlobik, who Officer Cooksey identified in court as Petitioner.  (RT 115-16.)  Petitioner had blood on his hands and an abrasion on his forehead.  (RT 116-17.)  Hlobik's cell phone and wallet were found in Petitioner's pants pocket. (RT 118-19.)

Joyce Adams testified that she lived in a room at the Travelodge motel with her son and daughter-in-law, who manage the motel.  (RT 125-26, 141.)  On October 18, 2008, at about 1:00 p.m., Adams said that Hlobik rang the bell; he was frantic, frightened, hysterical and bleeding profusely, and said he had been attacked in his room.  (RT 127.)  She dialed 911 and handed the telephone to Hlobik.  (RT 127.)  While Hlobik was making the call, a man walked by, whom Adams identified in court as Petitioner; Adams said Hlobik pointed at Petitioner and said he was

the man who had attacked him.  (RT 128-30.)  Adams saw Petitioner walking toward a white woman whom Adams did not recognize and who was yelling at Petitioner to hurry up.  (RT 128-32.)  Adams said that as Petitioner walked out of the parking lot with the white woman onto El Cajon Boulevard he was holding something in both hands wrapped in a T-shirt.  (RT 134-37.)  Adams later saw the police speaking with a black woman she had never seen before.  (RT 140-41.)

Heather Cannon, the manager of the Travelodge motel, testified that Hlobik is a permanent resident there, and that he never caused any problems or disturbances and always paid his rent on time.  (RT 143.)  Cannon called Hlobik's mother each week to get authorization to charge Hlobik's rent on her credit card.  (RT 144.)  The incident involving Petitioner and Hlobik was an unusual occurrence at the motel, and Cannon said she does not permit people on the property who are not registered guests or who have not checked in with her as guests of the residents.  (RT 148, 153.)  The People rested.  (RT 154.)

On the day trial started, the court denied a defense motion for a continuance in order to locate a percipient witness named Diemekia Reed, also known as Kiwi, a black woman whom the defense characterized as a "street person" who works as a prostitute around the high-crime, high-prostitution area of the motel.  (RT 3, 161.)  The motion was denied on the basis that there appeared to be no indication that the defense was going to find Reed anytime soon, and no substantial showing of materiality of her purported testimony.  (RT 6.)  The trial judge also indicated that there appeared to be no basis to admit a statement Reed had made to a District Attorney investigator two months after the incident.  (RT 7.)  In that statement, Reed admitted that she is well known on the streets as a crack cocaine smoker, that she knows Petitioner "as a smoker from the streets," that she and Hlobik were friends and smoked together but did not "date," that Hlobik did not deal drugs, that Hlobik never has any money and Reed looks after him and showers in his room.  (CT 113.)  She also indicated that she and Hlobik were together in his room about 6:00 a.m. that morning, that Reed told Hlobik she planned to "hustle up some money," and that she then met Petitioner, who had money and wanted to buy drugs and was with a white woman.  (Id.)  The next day, the second day of trial, after opening statements were

presented but before the first witness was called, the court indicated it had received information that Reed was in custody and would be produced for the defense, but that she would be appointed an attorney to advise her with respect to her appearance at trial based on the prosecution's representation that she might have been involved in the crime.  (RT 46.)

Diemekia Reed was called as the first defense witness but declined to answer any questions, indicating that she was following her appointed attorney's advice to invoke her Fifth Amendment right not to incriminate herself.  (RT 166-67.)  Defense counsel objected to her invocation, arguing that she did not appear to be subject to any liability from testifying, and even if she was, the District Attorney could give her immunity.  (RT 167-68.)  Defense counsel argued that the District Attorney had not charged her for her involvement in the incident, which had happened six months before, so it amounted to an abuse of discretion not to provide her immunity.  (RT 168.)  The prosecutor responded that his office had no intention of charging Reed in connection to Petitioner's offense, but declined to grant immunity.  (RT 168.)

The trial judge indicated that the decision to grant immunity is exclusively an executive function and nothing in the record indicated there was an abuse of discretion in the prosecutor's decision not to grant Reed immunity.  (RT 169.)  Reed's appointed attorney indicated that Reed was waiting to be arraigned on a prostitution charge which might be used to impeach her were she to testify at Petitioner's trial, and therefore she might incriminate herself in the prostitution case if she testified.  (RT 169-70.)  Reed's lawyer also indicated that Reed might be impeached by the statement she made to the District Attorney investigator admitting she smokes rock cocaine, and if she were to make an admission regarding that statement at Petitioner's trial it might be used against her in future prosecutions.  (RT 170.)  The court overruled the defense objection and found Reed's invocation valid, noting that there were "a number of areas where she might incriminate herself should she testify," including evidence presented at trial that Reed was outside the door of Hlobik's room under circumstances which the motel manager testified would arguably be a trespass.  (RT 171.)

Peter Barranco, a defense investigator, testified that he interviewed Hlobik on the telephone the previous day in order to clarify a statement Hlobik had made to Barranco six

weeks before trial regarding his relationship with Reed. (RT 181-82, 186.) Although Hlobik testified at trial that Reed had never been in his room, Barranco testified that Hlobik had admitted that he had allowed Reed into his room to use the bathroom on one occasion long before the assault. (RT 182.) Barranco testified on cross-examination that Hlobik appeared to be a very straightforward person, and that Hlobik had said that Reed had been with a group of other motel guests standing near his room on the occasion when she asked to use his bathroom, which happened to be the nearest one. (RT 183-86.)

Petitioner testified that he is a certified welder and that he got off work at 6:00 a.m. on October 18, 2008, and was dropped off at a liquor store near the Travelodge motel by a co-worker. (RT 190-93.) He was sitting outside the liquor store about 10:00 a.m. waiting for an acquaintance when he was approached by Reed, whom he had never met before and knew as Kiwi; he was drinking a 20-ounce bottle of wine and had taken prescription pain medication which enhanced the effects of the alcohol. (RT 192-93, 211-13.) Petitioner testified that Reed first asked for a cigarette, which he gave her, and then asked Petitioner if he wanted a "date," which led Petitioner to conclude she was a prostitute; when Petitioner declined sex, Reed asked if he wanted to go to see a friend of hers and have a drink. (RT 193, 218-19.) He agreed and they walked together to the Travelodge motel, about a block away. (RT 193.) Reed knocked on Hlobik's door about 10:30 a.m., but Hlobik said he was busy so Reed and Petitioner walked back to the liquor store without entering Hlobik's room. (RT 194-95.)

Petitioner testified that when they got back to the liquor store Reed asked if he had any money, and told Petitioner that Hlobik was going to be late on his rent and might get kicked out of his room. (RT 195.) Reed told Petitioner that she would pay him back as soon as Hlobik's mother wired him the money. (RT 196.) Petitioner said he gave Reed $40, and watched as Reed walked toward the motel with a white woman Petitioner did not know but Reed seemed to, who had joined them at the liquor store. (RT 196-97.) When Reed returned about 30-45 minutes later without the other woman, Petitioner purchased another bottle of wine and he and Reed walked back to the motel together. (RT 197.) Petitioner said that Reed knocked on Hlobik's door and he let them both in. (RT 198-99.)

Petitioner testified that as the three of them were sitting in Hlobik's room, Reed produced a pipe and crack cocaine which Reed and Hlobik smoked while Petitioner drank. (RT 198, 226.) After about 40 minutes, Petitioner said he was ready to leave and asked Reed to repay him. (RT 199.) Reed said: "Ask him," referring to Hlobik, and left the room. (RT 199, 225.) Petitioner asked Hlobik when his mother was going to wire the money so he can repay him, and Hlobik said it should be anytime now. (Id.) Petitioner told Hlobik he had to leave and asked for collateral for the $40 loan. (RT 200.) Petitioner said he picked up a cell phone and wallet from a table and said to Hlobik: "Let me hold this until you pay me my money back." (RT 200-01.) Petitioner testified that Hlobik shrugged his shoulders, indicating that it was alright, and Petitioner put the items in his pocket and turned to leave. (RT 201-02.)

Petitioner said that as he was leaving he was hit on the side of the head with a mallet. (RT 202-03.) When Petitioner turned around and saw Hlobik with his hand raised to administer another blow, he grabbed Hlobik's hand and they fell on the bed with Petitioner on top of Hlobik. (RT 204.) Petitioner wrestled the mallet from Hlobik's hand as Hlobik reached for a beer bottle which was on the bed. (RT 204.) Petitioner then struck Hlobik on the head with the mallet; Hlobik dropped the bottle, stopped fighting and said: "Okay. I'm cool. I'm cool." (RT 204-05.) Petitioner asked Hlobik why he attacked him, and Hlobik responded: "Oh, I don't know. I was trippin' or something." (RT 205.) Petitioner said he gave Hlobik a paper towel for the cut on his head and they both sat on the bed talking and nursing their wounds. (Id.) Reed then knocked on the closed door, and when Petitioner reached over and opened it, Hlobik ran out of the room screaming that Petitioner had hit him and robbed him. (RT 205-06.) Petitioner said he left the room and walked away without calling the police because he thought he was in trouble since he was on probation. (RT 206.)

On cross-examination Petitioner admitted that he had twice been convicted of felony possession of cocaine for sale. (RT 208.) He admitted that he was intoxicated at the time of the incident, admitted that he thought Reed and Hlobik had "played" him, and admitted he was upset and wanted his money back. (RT 233.) He denied bringing the mallet with him but admitted it is the type of mallet he uses in his work. (RT 227.) The defense rested. (RT 234.)

On rebuttal, the prosecution played a videotaped statement Petitioner made to the police on the afternoon of the day he was arrested, which he voluntarily gave in order to tell "his side of the story." (RT 236-29, 251.) A transcript of that interview is in the record. (CT 69-110.) Discrepancies between Petitioner's trial testimony and his recorded police statement include: (1) unlike his trial testimony, Petitioner told the police that he had been in Hlobik's room twice, as he, Reed and the white woman were inside the room with Hlobik the first time he went to the motel; (2) at trial he said he gave Reed $40 and watched her and the white woman walk towards the motel while he stayed behind, but in the police statement he said he gave Hlobik the $40 the first time he was in the motel room, which he later changed to say that he gave Reed the $40 on the way over and never saw Reed give Hlobik the money, which was what made him suspect he was being played; (3) he told the police he did not think Reed was a prostitute, although at trial he said he knew she was as soon as she asked him for a date; (4) he told the police he started the day with $120 and could not explain where the other $80 went, but at trial he testified that he started with $60-$80; (5) he testified at trial that he had been dropped off at the liquor store by a friend that morning, but told the police that he had left his house at 7:00 or 8:00 that morning and was walking to a friend's house when he stopped at the liquor store, which was out of his way; (6) he told the police that he bought Reed a pack of cigarettes but denied doing so at trial; (7) he told the police that neither Reed nor Hlobik smoked drugs that day; and (8) he told the police that he was wearing the mallet on his belt, which he used in his work, and that Hlobik had grabbed the mallet off his belt and used it to attack him. (Id.)

The prosecution recalled Officer Cooksey who testified that Petitioner made a brief statement upon arrest that he went to Hlobik's hotel to collect money he had lent to Hlobik "a few days ago," and when Hlobik said he did not have the money Petitioner took his cell phone and wallet and planned to hold those items until the money was repaid. (RT 241-43, 247.) Petitioner told Cooksey he had been hit with a bottle by Hlobik, but did not mention a mallet. (RT 245.) Tim Johnson, a San Diego Robbery Detective, interviewed Hlobik at the hospital on the afternoon of the incident. (RT 249.) Johnson said that Hlobik did not know the motivation for Petitioner's attack, but said it was not narcotics related. (RT 255-57.)

After deliberating about six hours, the jury found Petitioner not guilty of burglary (count two), and not guilty of assault with a deadly weapon (count three).  (RT 360-62; CT 152-54, 158-60.)  Petitioner was found guilty of robbery and the jury found that the residence was inhabited at the time of the robbery; the jury also found that Petitioner did not personally use a deadly or dangerous weapon and did not personally inflict great bodily injury on the victim.  (CT 156-57.)  Petitioner admitted the truth of the prior prison allegation, and was sentenced to four years on the robbery conviction plus one year for having served a prior prison term, for a total term of five years in state prison.  (RT 365-67, 382.)  Prior to sentencing, Petitioner submitted a letter to the trial judge asking for the robbery conviction to be reduced to a lesser offense, arguing that Reed's statement indicated that Hlobik had perjured himself at trial.  (CT 111-13.)

**IV.**

**PETITIONER'S CLAIM**

Petitioner alleges that his Sixth Amendment right to the effective assistance of counsel was violated because his counsel failed to object to, or appeal the decision of, the prosecutor and the trial judge not to grant Reed immunity.  (Pet. at 6.)

**V.**

**DISCUSSION**

For the following reasons, the Court finds that Petitioner's claim is procedurally defaulted and without merit.  Accordingly, the Court **RECOMMENDS** the Petition be **DENIED**.

**A.**     **Procedural Default**

Respondent first contends that Petitioner's claim is procedurally defaulted because it has never been presented to any state court.  (Answer at 17-19.)  Although Petitioner has not responded to the Answer, in his opposition to Respondent's motion to dismiss Petitioner admitted that he has never presented the claim to the state courts.  (Pet.'s Opp. [ECF No. 14] at 2-3.)  He contended, and the Court agreed, that the claim is technically exhausted because he no longer has state court remedies available.  (Id., citing Cassett v. Stewart, 406 F.3d 614, 621 n.5 (9th Cir. 2005) ("A habeas petitioner who has defaulted his federal claims in state court meets the *technical* requirements for exhaustion; there are no state remedies any longer 'available' to

him.").)  Petitioner also admitted that his failure to present the claim to the state courts has rendered it procedurally defaulted, but argued that he did not have access to legal materials where he was presently confined.  (Id.)

The claim which Petitioner presented to the state appellate and supreme courts alleged a violation of his federal constitutional rights to due process and compulsory process based on the trial judge's failure to exercise his discretion to grant immunity to Reed.  (Lodgment No. 3 at 21-35; Lodgment No. 7 at 3-22.)  The claim presented in this Court alleges that his appointed counsel failed to object to, or appeal the decision of, the prosecutor and the trial judge not to grant Reed immunity.  (Pet. at 6.)  Although the allegations of ineffective assistance of counsel have never been presented to any state court, the claim Petitioner presented on direct appeal included a summary of defense counsel's request for a continuance on the basis that Reed was an important defense witness, as well as defense counsel's objection to the refusal of the prosecutor to grant her immunity.  (Lodgment No. 3 at 21-28; Lodgment No. 7 at 3-11.)

The new allegations that trial counsel failed to object to the decision by the prosecutor and trial judge not to grant immunity, in addition to being refuted by the record with respect to the failure to object to the prosecutor's decision, have not been presented to the state court.  Over two and one-half years have passed since Petitioner filed his opening brief on appeal, and nearly one and one-half years have passed since the conviction became final.  As a result of Petitioner's failure to present his allegations to the state court, his Sixth Amendment ineffective assistance of counsel claim is procedurally defaulted in this Court.  See Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991) (holding that a procedural default arises when "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."); see id. at 729-30 (a procedural default arises from a violation of a state procedural rule which is independent of federal law, and which is clearly established and consistently applied.); see Bennett v. Mueller, 322 F.3d 573, 581 (9th Cir. 2003) ("We conclude that because the California untimeliness rule is not interwoven with federal law, it is an independent state procedural ground."); see also Walker v. Martin, 562 U.S. ___, 131 S.Ct. 1120, 1125-31 (2011) (holding that California's timeliness requirement providing

1   that a prisoner must seek habeas relief without "substantial delay" as "measured from the time

2   the petitioner or counsel knew, or should reasonably have known, of the information offered in

3   support of the claim and the legal basis for the claim," is clearly established and consistently

4   applied).  This Court may still reach the merits of the claim if Petitioner can demonstrate cause

5   for his failure to timely present his claim to the state courts and prejudice arising from the

6   default, or if he can demonstrate that a fundamental miscarriage of justice would result from the

7   Court not reaching the merits of the defaulted claim.[1]  Coleman, 501 U.S. at 750.

8   **1.  Cause**

9       The cause prong can be satisfied if Petitioner demonstrates some "objective factor" that

10  precluded him from raising his claims in state court, such as interference by state officials or

11  constitutionally ineffective counsel.  McCleskey v. Zant, 499 U.S. 467, 493-94 (1991).  In

12  Edwards v. Carpenter, 529 U.S. 446 (2000), the Supreme Court stated:

> Although we have not identified with precision exactly what constitutes "cause" to excuse a procedural default, we have acknowledged that in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice.  [*Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)]  Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution.  *Ibid*.  In other words, ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim.  And we held in *Carrier* that the principles of comity and federalism that underlie our longstanding exhaustion doctrine. . . require *that* constitutional claim, like others, to be first raised in state court.  "(A) claim of ineffective assistance," we said, generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default."  *Carrier*, *supra*, at 489.

21  Edwards, 529 U.S. at 451-52.

_____

[1]  Although Walker found California's timeliness rule to be clearly established and consistently applied, the Walker Court noted that a petitioner might be able to show the rule to be inadequate in his or her own case by showing that "the California Supreme Court exercised its discretion in a surprising or unfair manner."  Walker, 131 S.Ct. at 1130 ("A state ground, no doubt, may be found inadequate when discretion has been exercised to impose novel and unforeseeable requirements without fair or substantial support in prior state law.") (citation and internal quotation marks omitted); see also Kemma, 534 U.S. at 376 (recognizing exceptions where "exorbitant application of a generally sound state rule renders the state ground inadequate to stop consideration of a federal question.")  There is nothing in the record to suggest that an application of the California timeliness rule in this case would be unexpected or unfair.  Walker, 131 S.Ct. at 1130.  Even assuming Petitioner does not presently have the ability to present his claim to the state court due to the conditions of his present confinement as he alleged in his opposition to the motion to dismiss, the time to present the claim to the state courts has long since passed and he has alleged no facts indicating an inability to timely present the claim.

Petitioner alleges that his appointed counsel rendered constitutionally ineffective assistance in failing to object to, and appeal the decision of, the prosecutor and the trial judge not to grant Reed immunity.  As detailed above, Petitioner's trial counsel objected to the prosecutor's decision to deny Reed immunity, but did not object to the trial judge's decision, and his appellate counsel raised a claim on appeal challenging the trial judge's decision, but did not raise a claim challenging the prosecutor's decision.  Petitioner has not presented his ineffective assistance claim to the state courts so it cannot serve as cause to excuse the default.  Id.  In addition, as set forth below in the section of this Report addressing the merits of Petitioner's claim, Petitioner has failed to demonstrate that a federal constitutional violation arose as a result of Reed not being granted immunity, and has failed to demonstrate he received constitutionally ineffective assistance of counsel.  Because Petitioner has identified no other basis for cause, and none is apparent in the record, the Court finds that Petitioner has not established cause to excuse the procedural default.  McCleskey, 499 U.S. at 493-94; Edwards, 529 U.S. at 451-52.  Even assuming Petitioner could establish cause arising from his inability to pursue his claim in state court as a result of the conditions of his confinement (see Pet.'s Opp. to MTD [ECF No. 14] at 2-3), he is required to demonstrate both cause and prejudice, and for the following reasons he is unable to demonstrate prejudice.

## 2. Prejudice

In order to establish prejudice to overcome a procedural default, Petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  See United States v. Frady, 456 U.S. 152, 170 (1982) (discussing prejudice where defendant failed to object to jury instructions in proceeding under 28 U.S.C. § 2255).  "Prejudice [to excuse a procedural default] is actual harm resulting from the alleged error."  Vickers v. Stewart, 144 F.3d 613, 617 (9th Cir. 1998).

Petitioner cannot demonstrate prejudice sufficient to excuse the default because he cannot establish either deficient performance or prejudice under Strickland for the reasons discussed below in the merits section of this Report.  In that section of the Report, the Court finds that the

failure to grant Reed immunity did not infect the trial with error of constitutional dimension. Thus, Petitioner cannot establish "actual harm resulting from the alleged error" sufficient to excuse the default. <u>Vickers</u>, 144 F.3d at 617; <u>Frady</u>, 456 U.S. at 170.

### 3.  Fundamental miscarriage of justice

Petitioner can avoid a procedural default if he can demonstrate that a fundamental miscarriage of justice would result from the default.  The United States Supreme Court has limited the "miscarriage of justice" exception to petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995).  "In order to pass through <u>Schlup</u>'s gateway, and have an otherwise barred constitutional claim heard on the merits, a petitioner must show that, in light of all the evidence, including evidence not introduced at trial, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" <u>Majoy v. Roe</u>, 296 F.3d 770, 775-76 (9th Cir. 2002), quoting <u>Schlup</u>, 513 U.S. at 327.  In applying this standard, "A petitioner need not show that he is 'actually innocent' of the crime he was convicted of committing; instead, he must show that '"a court cannot have confidence in the outcome of the trial."' <u>Majoy</u>, 296 F.3d at 776, quoting <u>Carriger v. Stewart</u>, 132 F.3d 463, 478 (9th Cir. 1987) (en banc), quoting <u>Schlup</u>, 513 U.S. at 316.

The elements of robbery under California law are: (1) the use of force or fear to effect a taking from the victim, (2) accompanied by an intent to steal by the use of such means.  <u>People v. Waidia</u>, 22 Cal.4th 690, 737 (2000).  "If intent to steal arose only after the victim was assaulted, the robbery element of stealing by force or fear is absent." <u>People v. Bradford</u>, 14 Cal.4th 1005, 1055-56 (1997).  "A specific intent to steal requires a specific intent to *permanently* deprive the owner of his or her property.  If an individual who enters a dwelling or takes property intends only to temporarily deprive the owner, there is no intent to steal and hence no burglary or robbery." <u>People v. Thompson</u>, 27 Cal.3d 303, 313 n.4 (1980) (citations omitted) (italics in original).

Direct evidence that the elements of robbery were satisfied was presented to the jury in the form of Hlobik's testimony that Petitioner attacked him, immediately said that whatever

belonged to Hlobik now belonged to Petitioner, which indicated that the attack was for the purpose of permanently depriving Hlobik of his property, and then took the wallet and cell phone without consent after Hlobik fought to prevent the taking.  Petitioner contends that Reed's testimony could have established that Hlobik committed perjury when he denied smoking crack with Reed, and when he testified that he knew Reed only in passing and she had never been in his room.  Petitioner apparently refers to those portions of Reed's statement to the District Attorney investigator where she states that Hlobik is her friend and she looks after him and showers in his room, that they smoke together, that "a lot of people go to [Hlobik]'s room to smoke," and that Reed was with Hlobik at 6:00 a.m. on the morning of the incident.  (CT 113.)

Assuming Reed's testimony would have been consistent with her statement, and further assuming the jury would have believed her testimony, the circumstantial evidence supporting the robbery conviction presented at trial would not have been affected.  This evidence consisted of the fact that Hlobik sustained far more serious injuries than Petitioner, which tended to prove that Hlobik did not consent to have his property taken and that it was taken by force; the fact that Petitioner was much larger than Hlobik, which tended to show that Hlobik may have run from the room out of fear which allowed Petitioner to accomplish the taking; the fact that Petitioner took Hlobik's property after Hlobik fought to retain it, which tended to prove that Petitioner did not have consent to take Hlobik's property; and the fact that Petitioner fled and hid from the police, which demonstrated a consciousness of guilt and tended to prove that Petitioner was the aggressor and that he knew he did not have consent to take Hlobik's property.  Those facts were undisputed.  Even Petitioner's testimony that he thought he had Hlobik's consent to take the property because Hlobik shrugged his shoulders in response to Petitioner's statement that he was going to take the wallet and cell phone as collateral, does not support a finding that Petitioner had no intention to permanently deprive Hlobik of his property.  Rather, the shrug was, according to Petitioner's testimony, immediately followed by Hlobik attacking Petitioner to prevent the taking, Hlobik running from the room screaming that he had been robbed, and Petitioner taking the property anyway.  Reed could not provide the critical evidence necessary to demonstrate Petitioner's actual innocence of robbery because her prospective testimony could

not support Petitioner's contention that Hlobik consented to have his cell phone and wallet taken as collateral for a debt, as Petitioner testified that Reed had left the room at that time.  Reed was also out of the room during the altercation, and could not provide evidence regarding whether Petitioner took the property by force or whether he harbored an intent to steal.

Neither is it likely that Reed's testimony would have rehabilitated Petitioner's credibility, which was damaged by his prior drug convictions and the numerous inconsistencies between his trial testimony and statements he made to the police.  In addition, his story was not very credible, in that he said he met Reed only that morning and although he knew she was a prostitute he loaned her money to help someone he had never met pay his rent.  It is unlikely that Petitioner's lack of credibility would have been helped by the testimony of Reed, who by Petitioner's own admission had "played" him with the story that Hlobik needed money to pay rent.  Reed's own credibility would certainly have been challenged by her prostitution activities and her admission that she "is well known on the streets as a crack smoker."  (CT 113.)  In addition, Reed's testimony could have harmed Petitioner in that her statement indicates that she knows Petitioner "as a smoker from the street," that Petitioner "wanted to buy some stuff" and "tried to buy a dollar hit off her," and that Petitioner was with the white woman, not, as Petitioner testified, that the white woman was with Reed.  (Id.)  Moreover, as the jury convicted Petitioner of robbery but acquitted him of burglary and assault, it appears they did not believe Hlobik's testimony that Petitioner forced his way into the room and initiated the violence, but believed, consistent with Petitioner's testimony, that Hlobik fought to retain his property but Petitioner took it anyway.

Thus, even if Reed had testified consistently with her statement or consistently with Petitioner's version of the events, and assuming the jury believed her testimony, and further assuming that her testimony would have helped rather than hurt Petitioner's credibility, the jury would have had before them the same undisputed evidence upon which they convicted Petitioner of robbery, namely, that Petitioner was much larger than the victim, he inflicted serious wounds on the victim, he took the victim's property after the victim fought to retain it, and he then fled and hid from the police.  For these reasons, and as discussed below in addressing the merits of Petitioner's claim, Petitioner has not shown that it is more likely than not that no reasonable

juror would have found him guilty beyond a reasonable doubt had Reed testified at trial, or that the Court cannot have confidence in the outcome of the trial due to Reed's failure to testify. Majoy, 296 F.3d at 776; Schlup, 513 U.S. at 314-15.

### 4. Conclusion

Petitioner's claim is procedurally defaulted due to his failure to present it to the state courts and because it is now barred by California's timeliness rule. Petitioner is unable to establish cause, prejudice or the existence of a fundamental miscarriage of justice necessary to excuse the default. Thus, the Court **RECOMMENDS** the Petition be **DENIED** on the basis that the sole claim presented is procedurally defaulted.

### B.   Merits of the Petition

Respondent alternately argues Petitioner's claim is without merit. (Answer at 13-20.) Petitioner has not responded to the Answer. For the following reasons, the Court finds that Petitioner's claim is without merit.

### 1. Standard of review

The Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that a federal court may not grant habeas relief to a state prisoner with respect to any claim which has been adjudicated on the merits in the state court unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006). When a federal habeas court addresses a claim which has not been adjudicated on the merits in state court, pre-AEDPA de novo review is required. Pirtle v. Morgan, 313 F.3d 1160, 1167-68 (9th Cir. 2002). Under pre-AEDPA habeas review, "state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that [his] detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." Hayes v. Brown, 399 F.3d 972, 978 (9th Cir. 2005) (en banc). As Respondent correctly points out, the state appellate court here adjudicated a claim closely related to the claim Petitioner raises, and to the extent the state

court's reasoning is relevant, it must be considered by this Court under any standard of review. Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc) (holding that even if the state court does not address the constitutional issue, where the reasoning of the state court is relevant to resolution of the constitutional issue, that reasoning must be part of a federal habeas court's consideration even under a de novo review).

### 2. State Court Adjudication

To the extent the state court's reasoning is relevant, the Court must look through the silent denial of the claim Petitioner presented to the state supreme court to the reasoned decision of the appellate court. See Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.")  After determining that defense counsel's failure to object to the trial court's decision not to grant Reed immunity constituted a waiver of a challenge to that decision, the appellate court stated:

> Even were we to consider the merits of James's claim, we would reject it on grounds the trial court does not have inherent power to confer immunity on a witness called by the defense. (*People v. Lucas, supra*, 12 Cal.4th at p. 460, 48 Cal.Rptr.2d 525, 907 P.2d 373.)  In *Lucas*, the high court characterized as "doubtful" the proposition that the trial court has inherent authority to grant immunity.  (*Ibid.*; see also *People v. Stewart* (2004) 33 Cal.4th 425, 468, 15 Cal.Rptr.3d 656, 93 P.3d 271 (*Stewart*).)  It explained that "'the vast majority of cases, in this state and in other jurisdictions, reject the notion that a trial court has "inherent power" to confer immunity on a witness called by the defense.' (Citation.)  The one jurisdiction that recognizes such a power . . . also recognizes that "'the opportunities for judicial use of this immunity power must be clearly limited; . . . the proffered testimony must be clearly exculpatory; the testimony must be essential; and there must be no strong governmental interests which countervail against a grant of immunity. . . . (¶) (T)he defendant must make a convincing showing sufficient to satisfy the court that the testimony which will be forthcoming is both clearly exculpatory and essential to the defendant's case. Immunity will be denied if the proffered testimony is found to be ambiguous, not clearly exculpatory, cumulative or it is found to relate only to the credibility of the government's witnesses.'"'" (*People v. Lucas, supra*, 12 Cal.4th at p. 460, 48 Cal.Rptr.2d 525, 907 P.2d 373, quoting *People v. Hunter* (1989) 49 Cal.3d 957, 974, 264 Cal.Rptr. 367, 782 P.2d 608.)  Assuming a trial court possesses authority to order immunity, it may do so only if each of these three elements is met. (*Stewart*, at p. 469, 15 Cal.Rptr.3d 656, 93 P.3d 271.)  Fn.2.

> Fn.2: The California Supreme Court recognizes a second circumstance in which judicially conferred immunity to a defense witness might be constitutionally necessary: when the prosecutor intentionally refuses to grant immunity to a key defense witness for the purposes of suppressing essential, noncumulative exculpatory evidence, and thus distorts the judicial factfinding process. (*People*

*v. Stewart, supra*, 33 Cal.4th at p. 470, 15 Cal.Rptr.3d 656, 93 P.3d 271.) James does not raise this circumstance or such prosecutorial misconduct as a justification for immunity in this appeal. Nor does he argue that Reed's invocation of her right not to incriminate herself under the Fifth Amendment was somehow invalid or the result of trial court error. (See *People v. Cudjo, supra*, 6 Cal.4th at p. 617, 25 Cal.Rptr.2d 390, 863 P.2d 635 (trial court may compel witness asserting a Fifth Amendment privilege to answer questions only if it "'clearly appears to the court' that the proposed testimony 'cannot possibly have a tendency to incriminate the person claiming the privilege'").)

James concedes that no California court has yet found error in a trial court's refusal to grant use immunity where the prosecutor does not, as in this case. We decline in the absence of controlling precedent for such a holding. (Accord, *People v. Cooke, supra*, 16 Cal.App.4th at pp. 1367, 1371, 20 Cal. Rptr. 2d 506 (characterizing *Hunter's* language on judicial immunity as dicta and declining appellant's invitation to declare a doctrine of judicial use immunity for defense witnesses in criminal cases).) However, he maintains that in *Stewart, supra*, 33 Cal.4th 425, 15 Cal.Rptr.3d 656, 93 P.3d 271, *Cudjo, supra*, 6 Cal.4th 565, and *In re Williams* (1994) 7 Cal.4th 572, 29 Cal.Rptr.2d 64, 870 P.2d 1072, the high court has "reaffirmed" the viability of the Hunter analysis described above, which would have compelled the trial court to conclude Reed's testimony was crucial to his defense case, not cumulative, and "clearly exculpatory. . . ." Because the trial court did not consider the question in the first place, he asks us to remand the case for a hearing to determine whether a strong governmental interest justified the trial court's failure to consider granting such immunity to Reed, with an instruction that he receive a new trial with Reed's immunized testimony if the prosecutor is unable to demonstrate such an interest.

We cannot characterize the California Supreme Court's discussion in *Stewart*, *Cudjo*, or *In re Williams* as adopting or in any way affirming the *Hunter* analysis for purposes of assessing the entitlement to judicial use immunity. Our high court reemphasized the doubtful nature of the right in *People v. Williams, supra*, 43 Cal.4th 584, 75 Cal.Rptr.3d 691, 181 P.3d 1035 and *Lucas, supra*, 12 Cal.4th at page 460, 48 Cal.Rptr.2d 525, 907 P.2d 373, both decided after *Cudjo* and *In re Williams*, as well as in *Stewart, supra*, 33 Cal.4th at page 468, 15 Cal. Rptr.3d 656, 93 P.3d 271. The court merely engaged in the analysis based on its assumption of such a right for the sake of argument. (E.g., *Stewart*, at pp. 468-469, 15 Cal.Rptr.3d 656, 93 P.3d 271; see *People v. Williams*, at p. 622, 75 Cal. Rptr.3d 691, 181 P.3d 1035.) Doing so here, we conclude that even assuming the trial court could have granted immunity to Reed, we are not convinced that her proffered testimony in this case is so "clearly exculpatory" that it would meet the *Hunter* test articulated above. James argues only that "it is possible that (Reed) knew something about appellant's taking the phone and wallet for collateral" and "(w)ithout her testimony, that was not known." And, as the People point out, Reed did not mention James's asserted $40 loan in an interview by a defense investigator, and she was not present in the room when James took Hlobik's wallet and phone. As a consequence, her potential testimony would be ambiguous at best, failing to meet the "'convincing showing'" sufficient to satisfy the court that immunity should be conferred. (*People v. Stewart, supra*, 33 Cal.4th at p. 469, fn. 23, 15 Cal.Rptr.3d 656, 93 P.3d 271.)

(Lodgment No. 6, People v. James, No. D055352, slip op. at 10-12.)

### 3.      Clearly Established Federal Law

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must demonstrate two things.  First, he must show that counsel's performance was deficient. Strickland v. Washington, 466 U.S. 668, 687 (1984).  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id.  Second, he must show counsel's deficient performance prejudiced the defense.  Id.  This requires showing that counsel's errors were so serious they deprived Petitioner "of a fair trial, a trial whose result is reliable."  Id.  To satisfy the prejudice prong, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error.  Id. at 694.  A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome."  Id.  Petitioner must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel. Id. at 687.

"Surmounting Strickland's high bar is never an easy task."  Padilla v. Kentucky, 559 U.S. __, 130 S.Ct. 1473, 1485 (2010).  The standards created by Strickland and section 2254(d) are both highly deferential [and] difficult to meet" because federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction.  Harrington v. Richter, 562 U.S. ___, 131 S.Ct. 770, 788 (2011). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."  Id. at 791, quoting Strickland, 466 U.S. at 687.

### 4.  Analysis

Petitioner claims he received ineffective assistance of counsel because his appointed counsel failed to: (i) object to or appeal the prosecutor's refusal to grant immunity to Reed; and (ii) object to or appeal the trial court's decision not to grant Reed immunity.  (Pet. at 6.)

### i)  The prosecutor's decision not to grant immunity

As detailed above, Petitioner's trial counsel objected to the prosecutor's decision not to grant Reed immunity, and the trial court made a careful and explicit ruling on the objection.

Petitioner has identified nothing about counsel's objection which was deficient, and therefore has failed to demonstrate the deficient performance necessary to show ineffective assistance with respect to this aspect of his claim. Even if Petitioner could demonstrate deficient performance, however, he has not shown prejudice for the following reasons.

Petitioner contends his appointed counsel should have appealed the decision of the prosecutor not to grant Reed immunity. (Pet. at 6.) It is unclear whether Petitioner contends his trial counsel should have immediately appealed that decision during trial, or whether his appointed appellate counsel should have raised that claim on appeal, or both. In either case, Petitioner has established neither deficient performance nor prejudice. The Court will conduct a de novo review of this aspect of Petitioner's claim because it was never presented to any state court, but will consider the state court's reasoning on the related claim where relevant. Pirtle, 313 F.3d at 1167-68; Hayes, 399 F.3d at 978; Frantz, 533 F.3d at 738.

"The Fifth Amendment does not create a general right for a defendant to demand use immunity . . ., and the courts must be extremely hesitant to intrude on the Executive's decision to decide whom to prosecute." United States v. Straub, 538 F.3d 1147, 1166 (9th Cir. 2008); United States v. Mendia, 731 F.2d 1412, 1414 (9th Cir. 1984) ("[T]he decision to grant immunity to prospective defense witnesses is left to the discretion of the executive branch."). "To interpret the Fifth and Sixth Amendments as conferring on the defendant the power to demand immunity for co-defendant, potential co-defendants, or others whom the government might in its discretion wish to prosecute would unacceptably alter the historic role of the Executive Branch in criminal prosecutions." United States v. Alessio, 528 F.2d 1079, 1082 (9th Cir. 1976.) "Nevertheless, in exceptional cases, the fact-finding process may be so distorted through the prosecution's decisions to grant immunity to its own witness while denying immunity to a witness with directly contradictory testimony that the defendant's due process right to a fair trial is violated." Straub, 538 F.3d at 1166.

As quoted above, Petitioner did not allege in state court that the prosecutor refused to grant immunity to Reed for purposes of suppressing evidence and thereby distorting the judicial factfinding process. (Lodgment No. 6, People v. James, No. D055352, slip op. at 11, n.2.)

Rather, he alleged that the trial judge's failure to grant judicial immunity to Reed resulted in due process and compulsory process violations.  (Id. at 1.)  Nevertheless, considerations regarding the prosecutor's motives and the exculpatory nature of the suppressed evidence were found by the state court to be relevant to the merits of that claim.  (Id. at 10-12.)

As the appellate court correctly found, Reed's proffered testimony was not "clearly exculpatory."  (Id. at 12.)  The appellate court reasoned that Reed's potential testimony would have been ambiguous at best because she was not present when Petitioner took Hlobik's wallet and cell phone, and she did not mention Petitioner's alleged $40 loan during her statement.  (Id.) It is clear that Reed could have at best presented testimony contradicting Hlobik's testimony that the dispute was not drug related and that they did not know each other well, but Reed could provide no evidence exonerating Petitioner of robbery.  Petitioner admits that Reed was not in the room when Hlobik purportedly gave Petitioner permission to take his cell phone and wallet for collateral, and was not in the room anytime during their physical altercation.  Thus, Reed's testimony could not have been exculpatory.

Moreover, even if Reed had testified consistently with her statement or consistently with Petitioner's version of the events, and the jury believed her, thereby impeaching Hlobik, whose testimony the jury had already discounted in acquitting Petitioner of burglary and assault, the jury would have had before them the same undisputed evidence upon which they convicted Petitioner of robbery.  That evidence consisted of Hlobik's severe injury compared with the Petitioner's mild injury, which tended to prove that Hlobik did not consent to have his property taken and that it was taken by force, the relative size of the parties, which indicated that fear may have been involved, the fact that Petitioner took Hlobik's property after Hlobik fought to retain it, which demonstrated that an intent to steal existed contemporaneously with the taking, and Petitioner fleeing and hiding from the police, which demonstrated a consciousness of guilt which also tended to prove the property was taken without consent.  In fact, Petitioner testified that Hlobik merely shrugged his shoulders in response to Petitioner's statement that he intended to take the property as collateral, hardly the type of unequivocal agreement necessary to negate an intent to steal, especially considering Petitioner's testimony that Hlobik immediately thereafter

attacked Petitioner when he tried to leave with the property and ran from the room screaming that he had been robbed.  Thus, Petitioner's own testimony could be used by the jury to find that he took the Hlobik's wallet and cell phone without consent.

Neither could Reed's testimony establish that Petitioner was justified in believing that Hlobik owed him $40.  Rather, Petitioner testified that he thought he had been played by Reed, who he knew to be a prostitute, which tended to show that Petitioner was aware that Reed used the money to buy crack cocaine, not to pay Hlobik's rent.  Petitioner also admitted that he was intoxicated, angry about being played, and wanted his money back, further supporting the jury's finding that he took Hlobik's property by force or fear.  Petitioner's testimony that he encountered a prostitute he had never met before, gave her $40 to help a friend of hers he had never met before pay a motel bill, and believed such a minimal amount of money loaned for an hour or so would be sufficient to prevent the person from being evicted, strains credibility to the point that Reed's testimony that drugs were involved would likely not have rehabilitated Petitioner's credibility.  Even if the jury believed Reed, Petitioner was impeached by prior statements he made to the police that he had lent Hlobik the money a few days before, he had been in Hlobik's room twice, he gave the money to Hlobik and not Reed, he had walked to the liquor store from his home, that neither Reed nor Hlobik had smoked drugs that day, and, most importantly, that Petitioner brought the mallet into the room, which was a type he used in his work.  It is unlikely that Reed's testimony could have bolstered Petitioner's credibility because it is hard to imagine a witness more open to impeachment than Reed, a street prostitute who admitted to being "well known on the streets as a crack smoker."  (CT 113.)  In addition, Reed's testimony could have harmed Petitioner in that her statement does not mention the $40 debt, and indicates that she knows Petitioner "as a smoker from the street," that Petitioner "wanted to buy some stuff" that morning, and that he "tried to buy a dollar hit off her."  (Id.)

Even taking into consideration that the jury must have had doubts about Hlobik's credibility because they acquitted Petitioner of burglary and assault, and giving Petitioner the benefit of the doubt that Reed could have bolstered Petitioner's credibility or further damaged Hlobik's credibility, the appellate court was correct to find that Reed did not have clearly

exculpatory testimony to provide.  Her testimony, even if it provided evidence Hlobik owed Petitioner for drugs rather than a loan to pay rent, would not establish the crucial facts needed to support Petitioner's contention that Hlobik agreed to have his property taken as collateral. Rather, sufficient evidence would remain that Petitioner took Hlobik's property by force or fear without his consent irrespective of the nature of the alleged debt, and Reed's absence from the room during that crucial period precludes a finding that her testimony could have been clearly exculpatory.  Because no due process violation occurred as a result of the prosecutor's decision not to grant Reed immunity, Petitioner has not shown that his appointed counsel's failure to object to or appeal the decision of the prosecutor "'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."  Richter, 131 S.Ct. at 791, quoting Strickland, 466 U.S. at 687; see also Featherstone v. Estelle, 948 F.2d 1497, 1507 (9th Cir. 1991) (where "trial counsel's performance, although not error-free, did not fall below the Strickland standard[,] . . . petitioner was not prejudiced by appellate counsel's decision not to raise issues that had no merit."); Baumann v. United States, 692 F.2d 565, 572 (9th Cir. 1982) (stating that an attorney's failure to raise a meritless legal argument does not constitute ineffective assistance).  Based on a de novo review of this aspect of Petitioner's claim, the Court **RECOMMENDS** habeas relief be **DENIED**.

### ii)  The trial judge's decision not to grant immunity

The second aspect of Petitioner's claim alleges his counsel was ineffective for failing to object to or appeal the decision of the trial judge not to grant Reed immunity once the prosecutor declined to do so.  (Pet. at 6.)  Petitioner's appellate counsel raised a claim in the state courts challenging the trial court's decision to not grant immunity.  As set forth above, the appellate court found the claim had been waived as a result of trial counsel's failure to object at trial, and alternately denied it on the merits.  Petitioner's claim that his appointed counsel failed to present a challenge on appeal to the trial court's decision regarding immunity is therefore without merit, as his appellate counsel actually raised that claim on appeal.  However, Petitioner's trial counsel's failure to object to the trial court's decision not to grant immunity resulted in a waiver of that claim on appeal.  Nevertheless, Petitioner cannot establish Strickland prejudice as a result

of that failure because the state court actually reached the merits of the claim despite counsel's failure to object, and because the claim is without merit for the reasons set forth below.  The Court will conduct a de novo review of this aspect of Petitioner's claim because it was never presented to any state court, but will consider the state court's reasoning on the related claim where relevant.  Pirtle, 313 F.3d at 1167-68; Hayes, 399 F.3d at 978; Frantz, 533 F.3d at 738.

The United States Supreme Court has indicated that a witness can properly invoke her Fifth Amendment right when her answers "would furnish a link in the chain of evidence need to prosecute" her for a criminal offense.  Hoffman v. United States, 341 U.S. 479, 486 (1951).  The Court in Hoffman stated that the trial judge "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." Id. at 487.  "[I]t need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." Id. at 486-87.  The state appellate court here acknowledged the Hoffman standard, but found that Petitioner had not alleged that the trial judge had erred in failing to force Reed to testify, but had merely alleged that the trial judge should have exercised his discretion to grant Reed judicial immunity. (Lodgment No. 6, People v. James, No. D055352, slip op. at 11, n.2, citing People v. Cudjo, 6 Cal.4th 585, 617 (1993) (holding that state law provides, consistent with Hoffman, that the trial judge may compel a witness asserting a Fifth Amendment privilege to answer questions only if it "clearly appears to the court" that the proposed testimony "cannot possibly have a tendency to incriminate the person claiming the privilege."), citing Hoffman, 341 U.S. at 486.)  Thus, in determining whether Petitioner's appointed counsel rendered deficient performance in this respect, there is no determination from the state court.  Nevertheless, the state court's reasoning with respect to the challenge to the trial judge's decision not to grant judicial immunity is still relevant, particularly with respect to the finding that there was no showing that Reed had clearly exculpatory evidence to provide.

The trial judge here found that Reed might incriminate herself if she testified, and had therefore properly invoked her Fifth Amendment right, based on evidence adduced at trial that

she was at the motel under conditions which the motel manager testified would be a trespass, based on information from the prosecutor that she had a prostitution charge pending against her, and based on information from her appointed attorney that if she testified she might implicate herself in the pending prostitution charge and might be asked about the statement she made to the investigator admitting she was a crack cocaine user. (RT 169-71.) According to Petitioner's trial testimony, Reed approached him and solicited sex, and she smoked crack cocaine with Hlobik on the day of the incident. Thus, Reed could have implicated herself in prostitution, drug use, and trespass offenses on the day in question, and could have made admissions affecting her pending prostitution charge. Moreover, as discussed above, her testimony was not clearly exculpatory, and she could have at best challenged the victim's credibility and at worst further eroded Petitioner's credibility. It is evident from the record that Reed's invocation was proper, and there is no basis for Petitioner's contention that the trial judge should have compelled Reed's testimony. Hoffman, 341 U.S. at 486-87.

Because no federal constitutional violation occurred as a result of the trial judge's decision not to grant Reed immunity, and because the state court actually addressed the merits of the claim notwithstanding defense counsel's failure to object at trial, Petitioner has not shown that his trial counsel's failure to object to that decision "'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." Richter, 131 S.Ct. at 791, quoting Strickland, 466 U.S. at 687; Baumann, 692 F.2d at 572 (stating that an attorney's failure to raise a meritless legal argument does not constitute ineffective assistance). Based on a de novo review of this aspect of Petitioner's claim, the Court **RECOMMENDS** habeas relief be **DENIED**.

### 3. Conclusion

To the extent the Court can reach the merits of Petitioner's procedurally defaulted claim, the Court **RECOMMENDS** habeas relief be **DENIED** because Petitioner has established neither deficient performance nor prejudice arising from his appointed counsel's failure to object to or appeal the decision of the prosecutor and trial judge not to grant immunity to the defense witness.

# VI.

## <u>CONCLUSION AND RECOMMENDATION</u>

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **July 31, 2012**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **August 14, 2012.**  The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  July 9, 2012

Hon. Nita L. Stormes
U.S. Magistrate Judge
United States District Court